**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **COLUMBIA HOSPITAL AT MEDICAL CITY DALLAS SUBSIDIARY, L.P. D/B/A MEDICAL CITY DALLAS; KPH-CONSOLIDATION, INC. D/B/A HCA HOUSTON HEALTHCARE KINGWOOD; COLUMBIA MEDICAL CENTER OF PLANO SUBSIDIARY, L.P. D/B/A MEDICAL CITY PLANO; CHCA CLEAR LAKE, L.P. D/B/A HCA HOUSTON HEALTHCARE CLEAR LAKE;** | ) ) ) ) ) ) ) ) ) ) Case No. _____ ) ) ) ) |
| **Plaintiffs,** | ) ) ) |
| **v.** | ) ) |
| **BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD; IEC BENEFIT ADMINISTRATORS, INC D/B/A AMERIBEN SOLUTIONS, INC.,** | ) ) ) ) ) ) ) |
| **Defendants.** | ) |

## <u>PLAINTIFFS' COMPLAINT</u>

NOW COMES, Plaintiffs, Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood; Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano; CHCA Clear Lake, L.P. d/b/a HCA Houston Healthcare Clear Lake (collectively, "Plaintiffs" or "Hospitals"), by and through their attorneys, Polsinelli PC, and complains of Defendants, Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem GA"), and IEC Benefit Administrators, Inc d/b/a AmeriBen Solutions, Inc. ("AmeriBen") (collectively,

"Defendants"), as follows:

## STATEMENT OF FACTS

### A. PARTIES

1.     Plaintiff, Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas ("MC Dallas"), is a Texas limited partnership with its principal place of business in Dallas County, Texas. MC Dallas is a citizen of the State of Texas. MC Dallas has two partners: Columbia North Texas Subsidiary GP, LLC (its general partner), a Texas limited liability company with its principal place of business in Tennessee; and Medical City Dallas Partner, LLC (its limited partner), a Delaware limited liability company with its principal place of business in Tennessee. By and through its partners, MC Dallas is a citizen of the States of Texas, Tennessee, and Delaware.

2.     Plaintiff, KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood ("Kingwood") is a Texas for-profit corporation with its principal place of business in Harris County, Texas. Kingwood is a citizen of the State of Texas.

3.     Plaintiff, Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano ("MC Plano"), is a Texas limited partnership with its principal place of business in Collin County, Texas. MC Plano is a citizen of the State of Texas. MC Plano has two partners: Columbia North Texas Subsidiary GP, LLC (its general partner), a Texas limited liability company with its principal place of business in Tennessee; and Medical Center of Plano Partner, LLC (its limited partner), a Delaware limited liability company with its principal place of business in Tennessee. By and through its partners, MC Plano is a citizen of the States of Texas, Tennessee, and Delaware.

4.     Plaintiff, CHCA Clear Lake, L.P. d/b/a HCA Houston Healthcare Clear Lake ("Clear Lake") is a Delaware limited partnership with its principal place of business in Harris

County, Texas. Clear Lake has one partner-owner, Clear Lake Regional Medical Center, Inc., which is a Texas corporation with its principal place of business in Tennessee. By and through its partners, HCA Clear Lake is a citizen of the States of Texas and Tennessee.

5.      Defendant, Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem GA"), is a corporation organized under the laws of the State of Georgia doing business in Texas. Anthem GA is a citizen of the State of Georgia. Anthem GA does not maintain a regular place of business in Texas and does not have a designated agent for service of process. This lawsuit arises from Anthem GA's business in Texas, and it may, therefore, be served through the Texas Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044(b). Anthem GA's home office is located at 740 W. Peachtree St., Atlanta, Georgia 30308. Anthem GA is a licensee of the BCBSA (defined below) and is licensed to offer BCBS (defined below) branded health plans in the State of Georgia. As explained below, Anthem GA's Subscribers are not confined to the State of Georgia and routinely receive hospital services in other states, including Texas, for which Anthem GA is responsible.

6.      Defendant IEC Benefit Administrators, Inc d/b/a AmeriBen Solutions, Inc. ("Defendant" or "AmeriBen") is a corporation under the laws of the State of Idaho doing business in Texas. AmeriBen is a citizen of the State of Idaho but is registered to do business in the State of Texas. AmeriBen may be served by its registered agent, Christina Ramirez, at 8704 Moye Dr., El Paso, Texas 79925. AmeriBen is the third-party administrator that administered the Hospital's claim for services rendered to Patient 2 for Anthem GA. As explained below, AmeriBen authorized the services provided to Patient 2 in Texas pursuant to agreements by and between Anthem GA, Blue Cross Blue Shield of Texas ("BCBSTX"), and Plaintiffs.

### B.    JURISDICTION AND VENUE

7.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in Texas, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here. Further, as explained below, Anthem GA, as an "Affiliate" of BCBSTX (defined below) and as a "Payer" under the Agreements (defined below), is bound by all terms and provisions of the Agreements, including the requirement that the Agreements be governed by Texas law. Further, Defendants insure and/or administer health plans that cover Texas residents. Upon information and belief, all of the Subscribers (defined below) reside in the State of Texas. All of the Subscribers received medical services in the State of Texas. Defendants issued and/or administered these health plans to/for Texas residents knowing of the possibility of having to resolve disputes under the Agreements based on Texas law. Defendants therefore have sufficient contacts with the State of Texas and do business in the State of Texas for purposes of personal jurisdiction, and it is reasonably foreseeable that they would be hauled into a Texas court for their actions in connection with insuring and administering health plans that cover Texas residents.

8.    This Court has subject matter jurisdiction because this dispute is between citizens of different states (Plaintiffs are citizens of the State of Texas, Tennessee, and Delaware, and Defendants are citizens of the State of Georgia and Idaho) and involves an amount in controversy that is greater than $75,000. Further, this Court has subject matter jurisdiction because the Employee Retirement Income Security Act of 1974 ("ERISA") provides for nationwide service of process, and Defendants have sufficient minimum contacts with the United States as they do business in and are citizens of the United States. *See* 29 U.S.C. § 1132(e)(2).

9.    Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in this judicial district, as described below. Specifically, the healthcare claims and appeals of such claims were provided to BCBSTX for processing and then subsequently forwarded by BCBSTX to Defendants, as described in additional detail below. BCBSTX is headquartered in the Northern District of Texas. As such, BCBSTX partially processed these claims and provided notices of their adjudication on behalf of Defendants in the Northern District of Texas, thus making venue proper under 28 U.S.C. § 1391(b)(2). Venue is also proper under 29 U.S.C. § 1132(e)(2) because Plaintiffs have asserted a claim under ERISA, and the administration of these health plans, for purposes of the claims at issue, took place at least in part at BCBSTX, which is located in the Northern District of Texas. Further, at least some portion of the breach of the health plans at issue also took place in this judicial district, as Defendants denied reimbursement for medical services rendered in the Northern District of Texas.

### C. FACTUAL BACKGROUND

### I.    THE AGREEMENTS AND THE BLUECARD PROGRAM

10.    Plaintiffs are acute care hospital systems in Texas. Plaintiffs provide medically necessary services to their local communities.

11.    As part of their provision of medically necessary services to their local communities, Plaintiffs contracted with non-party BCBSTX through several agreements. Specifically:

1. Plaintiffs MC Dallas and MC Plano contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016) (as amended, the "North Texas Agreement");

2. Plaintiffs Kingwood and Clear Lake contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016) (as

amended, the "Gulf Coast Agreement");

(collectively, the "Agreements").[1] The Agreements specify the terms and conditions under which Plaintiffs will treat patients with Blue Cross and Blue Shield ("BCBS") health plans, referred to in the Agreements and herein as "subscribers,"[2] and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary services to a subscriber.

12.    The Agreements are far broader than the relationship between just Plaintiffs, BCBSTX, and subscribers enrolled in a BCBSTX health plan, however. The Agreements also cover treatment that Plaintiffs provide through the BlueCard Program to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's Blue Cross Blue Shield Association ("BCBSA") licensee. Anthem GA is the BCBSA licensee for the State of Georgia, and when the patients at issue in this dispute who are insured by Anthem GA (the "Subscribers") received medical care at the Hospitals in Texas, the claims associated with such care were properly submitted to the BCBSA licensee for the State of Texas, BCBSTX, for processing in accordance with the terms of BCBSTX's contract with the Hospitals, which are the Agreements. Defendants are bound by the Agreements in multiple ways: (1) by reason of its status as an "Affiliate" of BCBSTX; (2) as a "Payer" under the Agreement; and (3) by its participation in the BlueCard Program, which is explained in more detail below.

13.    The Agreements provide that (1) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (2) such out-of-state BCBS plans, as

---

[1] The Agreements contain confidentiality provisions which prevent Plaintiffs from attaching them to this Complaint. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered.

[2] When used generally herein, the term subscribers is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

"Affiliates" of BCBSTX, and as "Payers" under the Agreements, will access the discounted rates set forth in the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program; and (3) the out-of-state plans, as "Affiliates" of BCBSTX, and as "Payers" under the Agreements, will be bound by the terms and obligations of the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program, which includes the obligation to pay claims in accordance with the Agreements.

14.    In the present case, Defendants, by participating in the BlueCard Program, agreed to be a "Payer" under the Agreements.

15.    The Agreements explain that BCBSTX and any "Payer," which includes entities that are financially responsible for the payment of services under a health plan administered by BCBSTX and with which BCBSTX directly or indirectly contracts, are bound by the Agreements, including their provisions concerning the payment of claims.

16.    The definition of "Payer" in the Agreements includes participants in the BlueCard Program, like Defendants, because, under the BlueCard Program, Defendants are financially responsible for the claims submitted for its Subscribers, and Defendants partially delegate their duties as health plan administrator to BCBSTX for the processing of BlueCard claims.[3]

17.    Plaintiffs' expectations of reimbursement by Defendants at the rates specified in the Agreements were reinforced by Defendants' own conduct and representations, which are consistent with, if not express admissions of, Defendants being bound by the Agreements as an "Affiliate" of BCBSTX and the "Payer" of claims.

18.    Anthem GA represents on its website that the Hospitals are "in-network" with Anthem GA. Specifically, Anthem GA includes a page on its website where its subscribers with

---

[3] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas,* 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX acts as the administrator for . . . claims arising under the BlueCard program.").

Georgia health plans can locate care.[4]  Using the "Find Care" tool on Anthem GA's website reveals that Anthem GA is "in-network" with the Hospitals for each of the Subscribers' health plans.[5] Anthem GA's website explains the difference between "in-network" and "out of network" as follows: "Doctors, hospitals,  . . . may have a contract with us.  If they do, they're in our network - also called *in-network providers*. . . . If they don't have a contract with us, they're outside of our network - or *out of network providers*."[6]

19.    Further, in a provider manual published on Anthem GA's website (the "Provider Manual"), Anthem GA explains, "BlueCard is a national program that enables members of one BCBS Plan to obtain healthcare service benefits while traveling or living in another BCBS Plan's service area. The program links participating healthcare providers with the independent BCBS Plans across the United States and in more than 200 countries and territories worldwide through a single electronic network for claims processing and reimbursement."[7] Anthem GA further explains to its providers that "[t]he [BlueCard] program lets you submit claims for patients from other BCBS Plans, domestic and international, to your local BCBS Plan. Your local BCBS Plan is your sole contact for claims payment, adjustments and issue resolution."[8] The state's plan under which the subscriber is insured is referred to as the "Home Plan," and the local BCBS plan for the state

---

[4] *See Individual & Family Health Insurance Plans in Georgia*, Anthem (last visited Apr. 2, 2025), https://www.anthem.com/ga/individual-and-family/health-insurance. A printout of the webpage is attached hereto as Exhibit 1.

[5] *See Find Care*, Anthem (last visited Apr. 2, 2025), https://www.anthem.com/find-care/. Samples of the search results using Anthem GA's "Find Care" tool showing the Hospitals as "in-network" for the Subscribers are attached hereto as Collective Exhibit 2.

[6] *See Frequently Asked Questions (FAQ) in Georgia: Doctors – Hospitals – Facilities*, Anthem (last visited Apr. 2, 2025), https://www.anthem.com/ga/faqs#7 (emphasis in original). A printout of Anthem GA's Georgia FAQ page is attached hereto as Exhibit 3.

[7] *See GA BlueCard Provider Manual – 2022*, Anthem (last visited Apr. 2, 2025), https://www.anthem.com/content/dam/digital/docs/provider/commercial/manuals/PM_GA_00004.pdf. Relevant excerpts from the Provider Manual are attached hereto as Exhibit 4.

[8] *See id.*

in which the subscriber receives care is referred to as the "Host Plan."

20.     The Provider Manual also includes illustrations of how the BlueCard Program operates, which demonstrate that when a Home Plan's subscriber receives covered services in another state, the Home Plan "adjudicates the claim according to the member's benefits and the provider's arrangement with the [Host Plan]."[9]  This means that the Home Plan must pay for the covered services provided to its subscriber at the rates specified in the Host Plan's contract with the provider.[10]

21.     The Host Plan serves as the administrator for the subscribers' health plans when it handles claims through the BlueCard Program,[11] which is evidenced by the Host Plan charging an administration fee to the Home Plan.[12] The Host Plan also, upon information and belief, charges an access fee to the Home Plan to access the rates in the Agreements.

22.     Upon information and belief, the Host Plan and Home Plan have a direct or indirect contractual relationship relating to their participation in the BlueCard Program (*i.e.*, the Home Plan and Host Plan may directly contract with one another to participate in the BlueCard Program, or participation in the BlueCard Program may be a term of the licensing agreements between BCBSA and all BCBS licensees).[13]

---

[9] *See id.*

[10] *See e.g., In re: Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406)*, No. 2:13-CV-20000, 2018 WL 1640023, at *8 (N.D. Ala. Apr. 5, 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").

[11] *See Health Care Serv. Corp.,* 814 F.3d at 246 ("BCBSTX acts as the administrator for . . . claims arising under the BlueCard program.").

[12] *See id.,* at *8 ("Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived.").

[13] *See In re: Blue Cross Blue Shield Antitrust Litigation*, 2018 WL 1640023, at *8 ("Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area.").

23.    Through this network of contracts, the BlueCard program essentially operates as a rental network.

24.    Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: Anthem GA is the Home Plan for the Subscribers. The Subscribers receive care at the Hospitals in Texas. Plaintiffs submit its claims for reimbursement for the services it provided to Subscribers to BCBSTX. Then, BCBSTX, acting as the administrator of the Subscribers' health plans, reviews the claims, determines the amount that would be payable under the Agreements based on the services Plaintiffs provided to the Subscribers, and forwards the claims to Defendants for adjudication. Anthem GA, as the Home Plan, applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Agreements. BCBSTX then transmits the Home Plan's decisions and payments to Plaintiffs.

25.    Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Defendants to reimburse Plaintiffs for the services provided to its Subscribers at the rates specified in the Agreements, which are the rates Defendants agreed to pay, by virtue of its participation in the BlueCard Program, and as an "Affiliate" of BCBSTX and "Payer" under the Agreements.

26.    Additionally, for at least some of the Subscribers at issue in this dispute, Plaintiffs received correspondence or communications directly from Defendants, as opposed to BCBSTX, concerning the claims at issue.

27.    Anthem GA's Subscribers received medical services from Plaintiffs through the BlueCard Program, and accordingly, as an "Affiliate" of BCBSTX and the "Payer" responsible for the claims associated with such care under the Agreements, Defendants are contractually bound

by the Agreements, including its provisions obligating the "Payer" to timely and correctly pay claims at the rates set forth therein.

28.     Plaintiffs are authorized to assert the claims described herein on behalf of the Subscribers because upon admission to the Hospitals, each patient or their legal representative signs a form, often referred to as Conditions of Admission, that includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits in litigation or in any other forms of dispute resolution in any forum for any type of relief) to Plaintiffs. The Subscribers (or their legal representative) signed this Conditions of Admission form assigning their rights and benefits under their respective health plan to the Plaintiffs. These Conditions of Admission each contain the following provision or substantially similar language: "[p]atient assigns all his/her rights and benefits under existing polices of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider… I hereby irrevocably appoint the Provider as my authorized representative to pursue any claims…. and/or legal remedies." Further, Plaintiffs' claims for reimbursement (which were provided to Defendants) each indicated on field 53 of the claim form (UB-04) that they were being submitted pursuant to an assignment of benefits.

## II.     FACTS CONCERNING THE CLAIMS AT ISSUE

29.     <u>Patient 1, Admitted and Discharged in 2021:</u> At the time the services were rendered, Patient 1 was a 17-year-old female with a history of hypothyroidism who presented to MC Dallas for adrenal imaging for a suspected left adrenal pheochromocytoma (tumor in the adrenal gland). Prior to her presentation at MC Dallas, an abdominal ultrasound showed Patient 1 had a 4.5 cm mass in the left upper quadrant and elevated catecholamines, and an abdominal CT scan confirmed the mass in the left adrenal gland. Patient 1 underwent meta-iodobenzylguanidine ("MIBG")

single-photon emission computed tomography ("SPECT") imaging which confirmed a left adrenal pheochromocytoma.

30.    At the time of service, Patient 1 presented to MC Dallas with insurance through Anthem GA. That same day, MC Dallas confirmed with Anthem GA that authorization was not required for CPT 78075, the code for the services scheduled to be rendered to Patient 1. Ultimately, though, Patient 1 underwent procedures represented by CPT codes 78802 and 78803.

31.    On April 18, 2021, MC Dallas timely submitted a claim for the services provided to Patient 1 to BCBSTX for forwarding to Anthem GA. By remittance dated May 19, 2021, Anthem GA partially denied the claim (as to CPT codes 78802, 78803, and A9582) and claimed all other services were Patient 1's liability. Then, by correspondence dated May 20, 2021, MC Dallas was informed the claim was denied on the basis of a purported lack of pre-authorization.

32.    On May 26, 2021, MC Dallas submitted its first-level appeal to BCBSTX for forwarding to Anthem GA, enclosed Patient 1's medical records and an itemized bill, and requested a medical necessity review.

33.    On June 17, 2021, MC Dallas contacted a representative of BCBSTX who verified that the first-level appeal had been received and was being reviewed. Then on June 24, 2021, a BCBSTX representative again confirmed receipt of the appeal and stated it may take up to 45 days to review.

34.    By correspondence dated July 1, 2021, BCBSTX confirmed the claim denial had been upheld on appeal based on a benefit decision made by Anthem GA and stated that Patient 1 should contact Anthem GA for further information concerning medical record reviews.  On July 1, 2021, MC Dallas submitted a request for retroactive authorization of the services provided to

Patient 1 to BCBSTX for forwarding to Anthem GA. It is not clear whether Anthem GA ever acted upon this request for retroactive authorization.

35.     On or about July 13, 2021, MC Dallas submitted its second-level appeal to BCBSTX for forwarding to Anthem GA, including Patient 1's medical records, and requested a medical necessity review. On August 3, 2021, a BCBSTX representative verified receipt of the appeal. On August 10, 2021, and August 17, 2021, MC Dallas was informed by BCBSTX representatives that the second-level appeal remained under review.

36.     On August 24, 2021, MC Dallas was informed by a BCBSTX representative that Anthem GA upheld its denial on appeal and that the medical records provided with the appeal were purportedly unsolicited by Anthem GA. It is not clear from the record whether Anthem GA ever reviewed the submitted medical records on appeal, despite MC Dallas' request for a medical necessity review. By correspondence dated August 24, 2021, BCBSTX confirmed Anthem GA's denial was upheld on the basis of a decision by Anthem GA concerning Patient 1's member benefit coverage.

37.     The denial of MC Dallas' claim for services provided to Patient 1 on the basis of an alleged lack of authorization constituted a wrongful denial of benefits and should be reversed.

38.     First, MC Dallas confirmed that prior authorization was not required for the procedure MC Dallas believed Patient 1 would receive, CPT code 78075.[14] MC Dallas did not know at the time that the procedures actually performed would be under different CPT codes, 78802,[15] 78803,[16] and A9582.[17] The North Texas Agreement states that MC Dallas shall use its

---

[14] CPT code for adrenal nuclear imaging
[15] CPT code for rradiopharmaceutical localization of tumor or distribution of radiopharmaceutical agents(s).
[16] CPT code for radiopharmaceutical localization of tumor or distribution of radiopharmaceutical agents(s), tomographic (SPECT).
[17] CPT code for Iodine I-123 (iobenguane).

best efforts to comply with the preauthorization procedures provided for by the North Texas Agreement. By confirming that no authorization was required for the procedure believed to be performed, MC Dallas used its best efforts with the information known at the time, to comply with Anthem GA's preauthorization requirement. Thus, a denial for lack of preauthorization is inappropriate for this claim.

39.     Second, there is no indication that Anthem GA or BCBSTX performed a medical necessity review on appeal, despite MC Dallas' requests for the same. The medical records support that the services rendered to Patient 1 were medically necessary. The fact that AIM Specialty Health's Radiology Diagnostic Guidelines were met corroborates the medical necessity of the services provided by Patient 1's physicians in the exercise of their professional medical judgment.[18]

40.     Finally, Anthem GA suffered no prejudice due to any alleged lack of authorization because MC Dallas rendered medically necessary care to Anthem GA's member. Anthem GA has never challenged the appropriateness of the care provided to Patient 1.

41.     In sum, MC Dallas provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Dallas is entitled to be paid $29,479.16 for the medically necessary, covered services provided to Patient 1.

42.     Patient 2, Admitted and Discharged in 2021: At the time services were rendered, Patient 2 was a 66-year-old male with a medical history of hypertension, paroxysmal atrial fibrillation, coronary artery disease, and chronic low back pain. Patient 2 presented to Kingwood's

---

[18] AIM Specialty Health Guidelines (Carelon Guidelines as of 2023) are guidelines for the provision of specialty health services. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

emergency department with complaints of radiating substernal chest pain to his shoulders and shortness of breath. An echocardiogram revealed atrial fibrillation with rapid ventricular response. Patient 2 was administered intravenous antiarrhythmic drugs, which decreased his heart rate, and was subsequently admitted inpatient per physician order for further treatment and monitoring. Due to Patient 2's history of coronary artery disease, cardiology recommended further workup. Subsequently, Patient 1 underwent an echocardiogram, which showed decreased ejection fraction with heart failure.

43.     Throughout his admission Patient 2 received intravenous diuretics and underwent a diagnostic coronary angiography and left ventriculography without complication. Patient 2's heart rhythm continued to be monitored postoperatively, and he was cleared for discharge three days after his surgery.

44.     Patient 2 presented to Kingwood with insurance through Anthem GA/AmeriBen. Kingwood timely notified AmeriBen, who was listed as the primary contact on Patient 2's Anthem GA insurance card for pre-certification and member services, of Patient 2's admission. On April 7, 2021, an AmeriBen representative requested the clinicals to process Patient 2's inpatient authorization. On April 8, 2021, Kingwood faxed Patient 2's clinicals to AmeriBen and AmeriBen authorized Patient 2's entire inpatient admission under authorization number A210407079.

45.     On April 14, 2021, Kingwood timely submitted a claim for reimbursement to BCBSTX for forwarding to Anthem GA.

46.     By remittance dated May 13, 2021, Kingwood was informed the claim had been denied due to purported missing or incomplete medical records. In response, on May 17, 2021, Kingwood submitted Patient 2's medical records. On May 25, 2021, a BCBSTX representative confirmed receipt of the medical records and stated such records had been forwarded to Anthem

GA. On June 9, 2021, a BCBSTX representative informed Kingwood that no additional information was needed at that time.

47.     By correspondence dated June 10, 2021, AmeriBen informed Kingwood that despite the fact that AmeriBen had authorized Patient 2's entire inpatient admission, the claim had been denied purportedly due to a subsequent review by Patient 2's employer who claimed that the inpatient level of care was medically unnecessary.  Then, by remittance dated June 23, 2021, BCBSTX, on behalf of Anthem GA/AmeriBen, confirmed the denial on the basis of a purported lack of medical necessity.

48.     On July 1, 2021, Kingwood timely submitted its first-level appeal to BCBSTX for forwarding to Anthem GA, with Patient 2's medical records, and requested a medical necessity review. On July 22, 2021, a BCBSTX representative informed Kingwood that Anthem GA had upheld the denial on appeal based on a purported lack of medical necessity.

49.     On July 29, 2021, Kingwood submitted its second-level appeal to BCBSTX for forwarding to Anthem GA, with Patient 2's medical records, and again, requested a medical necessity review. By remittance dated August 26, 2021, Kingwood was informed that Anthem GA had upheld the denial on appeal based on a purported lack of medical necessity.

50.     The denial of Kingwood's claim for inpatient cardiology services provided to Patient 2 for a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

51.     First, AmeriBen, on Anthem GA's behalf, preauthorized the services Kingwood rendered to Patient 2. In their denial letter dated June 10, 2021, AmeriBen acknowledged it had preauthorized the services on the basis that it determined them to be medically necessary. AmeriBen/Anthem GA is prohibited by Texas law from denying payment for Kingwood's

medically necessary services under these circumstances. *See* Tex. Ins. Code § 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care"). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

52.     Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem GA/AmeriBen is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

53.     In sum, Kingwood provided medically necessary, covered services to Patient 2 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Kingwood is entitled to be paid $25,450.29 for the medically necessary, covered services it provided to Patient 2.

54.     <u>Patient 3, Admitted and Discharged in 2021:</u>  At the time the services were rendered, Patient 3 was a 59-year-old male with a history of multiple bilateral total knee replacements, the most recent occurring two years prior to admission. Despite prior knee replacements, Patient 3 continued to experience persistent knee pain, multidirectional instability, and arthrofibrosis in the right knee, attributed to a nickel allergy associated with a previous knee replacement. Patient 3 was admitted as an inpatient to MC Plano per physician order for open incisional biopsy of the right knee followed by radical debridement, saucerization of the femur and tibia followed by removal of the prostheses, requiring mobilization of the popliteal vessel and sciatic nerve, and a revision total knee replacement with antibiotic cement and stimulant pellets.

55.    Post-operatively, Patient 3 experienced hypertensive urgency and was treated with labetalol and hydralazine in the PACU and nephrology was consulted due to elevated creatinine. Patient 3 had Hemovac drains with initially high output and remained admitted while the drain output gradually decreased. On post-operative day two, cultures were obtained, and the results on post-operative day five revealed no growth. By post-operative day seven, Patient 3's drain output had decreased to less than 100 cc, at which time the drains were removed, and Patient 3 was cleared to be safely discharged home.

56.    At the time of surgery, Patient 3 presented to MC Plano with insurance through Anthem GA. MC Plano timely faxed updated clinicals to Anthem GA for authorization throughout Patient 3's admission. Per correspondence from Anthem GA dated August 26, 2021, Patient 3's first two dates of service were authorized (the day of the operation and post operative day one) and determined to be medically necessary for an acute level of care under authorization number UM21282634. MC Plano continued to fax updated clinicals to Anthem GA on August 27, 2021, August 30, 2021, and September 1, 2021, for authorization of Patient 3's remaining dates of service. However, per correspondence dated September 1, 2021, after Patient 3's discharge, Anthem GA only authorized two of the remaining six dates of service (post-operative day two and three) but denied the remaining (post-operative days four through seven) on the basis of a purported lack of medical necessity.

57.    On September 4, 2021, MC Plano timely submitted a claim for the services provided to Patient 3 to BCBSTX for forwarding to Anthem GA. Via remittance, BCBSTX requested MC Dallas upload an itemized bill of Patient 3's services and his medical records. On September 13, MC Dallas submitted an itemized bill to BCBSTX and on September 14, 2021, MC Plano submitted Patient 3's medical records.  Via remittance dated September 23, 2021, MC Plano

was notified that Anthem GA had fully denied the claim on the basis of a lack of coverage and transferred the claim to the proper payer for processing. MC Plano was able to verify that Patient 3 had active coverage through Anthem GA for the dates of service. On September 28, 2021, a BCBSTX representative clarified that a new claim had been initiated because Patient 3's subscriber number had changed. On October 5, 2021, MC Plano was informed by a BCBSTX representative that Patient 3's medical records had been previously uploaded but not routed to Anthem GA so the representative routed the records to Anthem GA but stated that review would take up to 60 additional days. Via remittance on October 7, 2021, MC Plano was notified that Anthem GA had denied the claim in full due to a purported lack of medical necessity.

58.     On or about October 11, 2021, MC Plano submitted its first-level appeal to BCBSTX for forwarding to Anthem GA, enclosed Patient 3's medical records, and requested a medical necessity review. On November 8, 2021, MC Plano was informed by a BCBSTX representative that Anthem GA upheld its denial on the basis of a purported lack of medical necessity.

59.     On November 9, 2021, MC Plano submitted its second-level appeal to BCBSTX for forwarding to Anthem GA.

60.     Per correspondence from BCBSTX dated December 2, 2021, Anthem GA upheld the claim denial and stated that all levels of appeal were exhausted. This was further confirmed by correspondence from BCBSTX dated December 7, 2021. Then on December 8, 2021, MC Dallas was informed by a BCBSTX representative that Anthem GA had maintained the denial on appeal based on a purported lack of medical necessity.

61.     The denial of MC Plano's claim for the services provided to Patient 3 on the basis of purported lack medical necessity constituted a wrongful denial of benefits and should be reversed.

62.     First, the services provided were at least partially authorized. MC Plano received authorization approving inpatient surgery and admission through post-operative day three. Anthem GA is prohibited by Texas law from denying payment for medically necessary services under these circumstances. *See* Tex. Ins. Code § 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care"). Further, under the terms of the North Texas Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here. Moreover, the inpatient services provided were medically necessary as supported by Patient 3's medical records.

63.     In sum, MC Plano provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services.  According to the terms of the North Texas Agreement, MC Plano is entitled to be paid $202,606.47 for the medically necessary, covered services it provided to Patient 3.

64.     Patient 4, Admitted and Discharged in 2022: At the time the services were rendered, Patient 4 was a 61-year-old male. Patient 4 presented to Clear Lake's emergency department via ambulance with weakness, difficulty standing, nausea, and vomiting. The paramedics found Patient 4 to have significantly elevated blood pressure (215/112) and left-sided weakness. In route to Clear Lake, Patient 4 began to report right visual field loss. Once Patient 4 presented to Clear Lake, CT angiography imaging of Patient 4's head and neck were taken. That imaging showed left

vertebral occlusion and P2 occlusion. While in the emergency department, Patient 4's condition worsened, resulting in intubation due to respiratory failure. As a result, Patient 4 was admitted to Clear Lake's Intensive Care Unit ("ICU") per physician order and interventional radiology performed an emergency angiogram and thrombectomy of the basial artery, left posterior artery and left vertebral artery. During Patient 4's admission, he was seen by neurology and was evaluated by, and participated in, physical therapy, occupational therapy, and speech therapy. Patient 4 improved gradually and once stabilized, Patient 4 was discharged home with home health services after four days of inpatient admission.

65.    When Patient 4 presented to Clear Lake's emergency department, he did not provide his insurance information and was registered as uninsured; however, on the last day of Patient 4's admission, Patient 4's spouse provided Clear Lake with notice that he had an Anthem GA health plan.

66.    Once insurance information was received, Clear Lake promptly sought authorization for Patient 4's inpatient admission. On December 2, 2022, Clear Lake faxed Patient 4's discharge information and updated clinicals to Anthem GA. That same day, Anthem GA sent authorization approving one day of inpatient admission under authorization number UM37563681.

67.    Since authorization was only approved for one day of admission, Clear Lake called Anthem GA on December 9, 2022, to seek authorization of the additional dates of service. Anthem GA's representative instructed Clear Lake to resubmit Patient 4's clinicals, which Clear Lake promptly did that same day. On December 12, 2022, Anthem GA approved the remaining three days of inpatient admission, for a total of four days, all under authorization number UM37563681.

68.    On December 13, 2022, Clear Lake timely submitted its claim for the services rendered to Patient 4 to BCBSTX for forwarding to Anthem GA. Despite previously authorizing

all dates of service, Anthem GA denied the claim based on a purported lack of authorization per remittance advice received from BCBSTX on February 28, 2023.

69.    On March 3, 2023, Clear Lake timely filed its first-level appeal to BCBSTX for forwarding to Anthem GA, enclosed Patient 4's medical records, and requested a medical necessity review. Via letter dated March 24, 2023, BCBSTX notified Clear Lake that the denial was upheld, stating that the claim was processed correctly, however, a specific basis for the denial was not provided.

70.    On April 11, 2023, Clear Lake submitted its second-level appeal to BCBSTX for forwarding to Anthem GA, enclosed Patient 4's medical records, and again requested a medical necessity review. Via a telephone call with BCBSTX on May 2, 2023, Clear Lake was notified that Anthem GA upheld the denial on April 25, 2023, however a specific basis for the denial was not provided.

71.    The denial of Clear Lake's claim for services rendered to Patient 4 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

72.    First, Anthem GA authorized the services rendered to Patient 4. Anthem GA is prohibited by Texas law from denying payment for Clear Lake under these circumstances. *See* Tex. Ins. Code § 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

73.    Second, there is no indication that Anthem GA performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Clear Lake's request for

the same. Further, the services rendered were medically necessary as evidenced by Patient 4's medical records.

74.     Third, at least some portion of the billed services constituted emergency and post-stabilization services for which Anthem GA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code § 1301.155.

75.     In sum, Clear Lake provided medically necessary, covered services to Patient 4 and is entitled to payment in full for those services.  According to the terms of the Gulf Coast Agreement, Clear Lake is entitled to be paid $65,538.80 for the medically necessary, covered services it provided to Patient 4.

### D.  CAUSES OF ACTION

### COUNT I – FAILURE TO COMPLY WITH HEALTH BENEFIT PLAN IN VIOLATION OF ERISA

76.     The foregoing paragraphs are incorporated by reference.

77.     As explained above, Plaintiffs provided medically necessary covered services to the Subscribers described above, all of whom are Anthem GA's Subscribers (Patient 2's plan is administered by AmeriBen).[19]  Plaintiffs are therefore entitled to be paid the amounts due under the Agreements for that care.

78.     Defendants are Affiliates and a Payer, and the Agreements apply to Plaintiffs' treatment of Defendants' Subscribers. Upon information and belief, Plaintiffs are also entitled to payment under the terms of each Subscriber's health plan, because each of the inpatient admissions was a medically necessary covered service that is covered by each Subscriber's health plan.

---

[19] AmeriBen only administers Patient 2's health plan. As such, any reference to breaches or improper denials by AmeriBen relate only to Patient 2.

79.     Upon information and belief, some of the Subscribers whose hospital admissions are at issue are Subscriber(s) to an employer-sponsored health insurance policy that Defendants administer or underwrite. Thus, ERISA governs those health plans.

80.     Plaintiffs are entitled to enforce the terms of the Subscribers' health plans as the Subscribers' assignee under 29 U.S.C. § 1132(a)(1)(B). Upon admission to the Hospitals, each patient signs a form, often referred to as Conditions of Admission, that includes an assignment of the patient's health insurance benefits (including an assignment of rights) to Plaintiffs.

81.     When Plaintiffs appealed each of the wrongful denial of benefits described above, it requested copies of the relevant health plan documents along with a statement of the plan's review procedures and time limits applicable to such review procedures, including any contractual limitations and any plan provisions that Defendants were relying upon for its denial. Defendants did not provide the requested health plan documents, plan provisions, or otherwise advise Plaintiffs of contractual limitations or other relevant provisions from the health plan documents at any point during the claims adjudication or appeals process.

82.     As explained above, Plaintiffs provided medically necessary services to each Subscriber at issue. On information and belief, those services qualify as covered services under the Subscribers' health plans, and Defendants are therefore obligated to pay Plaintiffs for those services.

83.     As explained above, Defendants failed to pay Plaintiffs for the covered services that it provided to these Subscribers. Defendants' wrongful denial of benefits for the medically necessary inpatient hospital services that Plaintiffs provided to these Subscribers breached the terms of each Subscriber's health plan, under which Plaintiffs have standing to sue through the

Subscribers' assignments of benefits and rights via the Conditions of Admission that they executed upon admission to the Hospitals, as applicable.

84.     As a proximate result of Defendants' breach of these Subscribers' health plans, Plaintiffs have been damaged in an amount in excess of the jurisdictional requirements of this Court. Plaintiffs are entitled to recover payment in an amount not less than $323,074.72 for the medically necessary covered services it provided to these Subscribers as pleaded above.

### COUNT II – BREACH OF CONTRACT (AGREEMENTS) (AS TO ANTHEM GA ONLY)

85.     The foregoing paragraphs are incorporated by reference.

86.     As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat Subscribers with BCBS health plans and be reimbursed for that treatment.

87.     Specifically, Anthem GA is bound by the Agreements for three reasons: (1) as an "Affiliate" of BCBSTX under the Agreements; (2) as a "Payer" under the Agreements; and (3) by reason of its participation in the BlueCard Program, through which, upon information and belief, it enters into contracts with BCBSTX or the BCBSA, which should be construed as one contract with Plaintiffs' Agreements with BCBSTX.

88.     With respect to claims processed by BCBSTX for Anthem GA, under the BlueCard Program, Anthem GA is both an "Affiliate" and a "Payer" as defined in the Agreements. Accordingly, and as expressly provided in the Agreements, Anthem GA is bound by the terms of the Agreements, including their payment terms.

89.     The Agreements specifically allow "Affiliates" of BCBSTX and particularly, other BCBS plans through the BlueCard Program, access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with all terms and provisions of

the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to subscribers of "Affiliates," which includes Anthem GA, as set forth in and subject to the terms and conditions of the Agreements.

90.     Anthem GA, by their conduct in processing the claims, communicating with Plaintiffs regarding such claims, and authorizing the care provided on some of the claims, did in fact access and rely upon the Agreements. As an "Affiliate" of BCBSTX which has accessed and relied upon the Agreements, and acted as an assignee of the Agreements, Anthem GA is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

91.     Anthem GA is also a "Payer" under the Agreements because, upon information and belief, Anthem GA and BCBSTX contract directly or indirectly with one another to participate in the BlueCard Program, and under the BlueCard Program, Anthem GA is financially responsible for claims for which BCBSTX serves as administrator. Anthem GA's acknowledgement of their financial responsibility for the claims is supported by correspondence and authorizations received from Anthem GA (and/or AmeriBen on Anthem GA's behalf) for the Subscribers, as well as by the fact that the Home Plan accounts, upon information and belief, for payments made for claims processed under the BlueCard Program as expenses on its federal taxes. BCBSTX serving as administrator for the health plans for claims processed through the BlueCard Program is evidenced by the fact that Host Plans charge an administration fee for BlueCard claims.  Under the Agreements, "Payers" are bound by the terms of the Agreements, including their payment terms, to the same extent as BCBSTX.

92.     Anthem GA's intent to be bound by the terms of the Agreements is also demonstrated by the representations made by Anthem GA to their subscribers and to providers. Specifically, Anthem GA represents that the Hospitals are "in-network" with Anthem GA through

the BlueCard Program. Further, Anthem GA also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan.

93.    Additionally, upon information and belief, the BlueCard program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as Anthem GA, nation-wide access to in-network reimbursement rates of affiliated BCBS health plans, such as BCBSTX, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan that issues the policy. In fact, each licensee must make its in-network rates available to all other plans. The Host Plan charges the Home Plan an access fee for access to the local rates, and an administrative fee for processing claims. In effect, these nation-wide contracts provide a means by which individual licensees of the BCBSA, such as BCBSTX, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as Anthem GA, thus allowing those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts. The assigning BCBSA licensee, which in this case is BCBSTX, then acts as the claims administrator and forwards the claims to the Home Plan, which in this case is Anthem GA, for final determination and payment, for which the Home Plan is also obligated.

94.    Under this arrangement, the BlueCard Program is essentially a rental network.

95.    Accordingly, Plaintiffs contract with BCBSTX, and, upon information and belief, BCBSTX contracts with Anthem GA (directly or indirectly through the BCBSA) to grant Anthem GA access to the negotiated rates and terms between Plaintiffs and BCBSTX as set forth in their Agreements.

96.     Under Texas law, when there are multiple contracts between multiple parties in the rental network context, courts have construed the agreements as one contract between the multiple parties.

97.     In this case, the Agreements between the Hospitals and BCBSTX and any agreements between BCBSTX and Anthem GA, whether direct or indirect through the BCBSA, should be construed as one contract, such that Anthem GA is bound by the terms of BCBSTX's Agreements with the Hospitals.

98.     Anthem GA knew that by participating in the BlueCard Program with BCBSTX that it would be bound by the terms of BCBSTX's contracts with its local providers, like the Hospitals, which is evidenced by the Agreements' express references to "Affiliates" and "Payers" being bound by the terms of the Agreements.

99.     Accordingly, there was a meeting of the minds between Plaintiffs and Anthem GA as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

100.     Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

101.     Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Agreements.

102.     Anthem GA breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

103.     Plaintiffs suffered damages as a direct and proximate result of Anthem GA's breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than

$323,074.72 under the Agreements for the medically necessary, covered services that Plaintiffs provided to Anthem GA's Subscribers.

### COUNT III - BREACH OF CONTRACT (FOR PLANS NOT SUBJECT TO ERISA)

104.    The foregoing paragraphs are incorporated by reference.

105.    Alternatively, Plaintiff provided medically necessary covered services to each of the Subscribers whose hospital admissions are at issue, and those services are covered under the terms of each Subscriber's respective health plan. To the extent that any of those health plans are not subject to ERISA, Plaintiff is entitled to recover payment under the plan under a common law claim for breach of contract.

106.    Each health plan is a contract between the Subscriber and Defendants under which Defendants agree to cover medically necessary covered services that the Subscriber receives. Plaintiff has standing to sue for breach of contract for Defendants' failure to pay for these Subscribers' hospital admissions because each Subscriber assigned their benefits and rights under the health plan to Plaintiff.

107.    Plaintiff performed its obligations under the Subscribers' health plans by providing medically necessary covered services to each Subscriber.

108.    Anthem GA (and AmeriBen with respect to Patient 2) breached each of the Subscribers' health plans by failing to issue payment to Plaintiff at the rates set forth in the Agreement for the medically necessary covered services that Plaintiff provided.

109.    Plaintiff suffered damages due to Defendants' breach of each Subscriber's health plan; specifically, Plaintiff is entitled to be reimbursed in an amount not less than $323,074.72 under the Agreement for the medically necessary covered services that Plaintiff provided.

## COUNT IV – BREACH OF IMPLIED-IN-FACT CONTRACT (AS TO ANTHEM GA ONLY)

110.     The foregoing paragraphs are incorporated by reference.

111.     Alternatively, if Anthem GA is not bound by the terms of the Agreements as an "Affiliate" of BCBSTX or a "Payer", Plaintiffs are entitled to be reimbursed for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and Anthem GA by reason of Anthem GA's participation in the BlueCard Program.

112.     As participants in the BlueCard Program, Plaintiffs and Anthem GA impliedly agreed and understood that: (1) Plaintiffs would provide services to Anthem GA's subscribers, (2) Plaintiffs would submit claims to BCBSTX, Anthem GA's agent, for forwarding to Anthem GA for services provided to the subscribers, and (3) Anthem GA would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with BCBSTX.

113.     By participating in the BlueCard Program, Anthem GA, as an "Affiliate" of BCBSTX and a "Payer," was obligated to reimburse Plaintiffs at the rates set forth in the Agreements, even if Anthem GA was not a signatory to the Agreements.

114.     Anthem GA's intent to be bound by an implied-in-fact contract with Plaintiffs is also evidenced by Anthem GA's conduct. Anthem GA participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, authorized the care to be provided in some of the claims, and reviewed and adjudicated appeals.

115.     Anthem GA's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by Anthem GA to their subscribers and local providers.  Specifically, Anthem GA represents that the Hospitals are "in-network" with Anthem GA through the BlueCard Program, meaning it has a contract with Plaintiffs. Further, Anthem GA also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims

for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan.

116.    Accordingly, there was a meeting of the minds between Plaintiffs and Anthem GA as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

117.    Plaintiffs and Anthem GA understood Anthem GA to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of its participation in the BlueCard Program and by Anthem GA's own conduct and representations.

118.    In reliance on the implied-in-fact contract formed between Plaintiffs and Anthem GA by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to Anthem GA's Subscribers with the expectation that Anthem GA would reimburse Plaintiffs for such services according to the terms of the Agreements.

119.    By denying claims for services provided by Plaintiffs to Anthem GA's Subscribers, Anthem GA has breached the implied-in-fact contract existing between Plaintiffs and Anthem GA.

120.    Plaintiffs have suffered damages as a direct and proximate result of Anthem GA's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $323,074.72 for the medically necessary, covered services Plaintiffs provided to Anthem GA's Subscribers.

### COUNT V – PROMISSORY ESTOPPEL

121.    The foregoing paragraphs are incorporated by reference.

122.    As stated above, with respect to some of the claims at issue in this dispute, Anthem GA (and AmeriBen with respect to Patient 2) authorized the services rendered by Plaintiffs to Defendants' Subscribers.

123.    Plaintiffs reasonably relied upon Defendants' authorizations as promises to pay the rates set forth in the Agreements for the services provided to its Subscribers and continued to provide such services to Defendants' Subscribers.

124.    Defendants knew or reasonably should have known that Plaintiffs would rely on their promises to pay the rates set forth in the Agreements for the services that Plaintiff provided to Defendants' Subscribers.

125.    Injustice to Plaintiffs can be avoided only if Defendants' promise to pay the rates set forth in the Agreements for the services Plaintiffs provided to Defendants' Subscribers with respect to the claims that they authorized is enforced.

126.    Plaintiffs' reliance on Defendants' promise to pay the rates set forth in the Agreements for the services Plaintiffs provided to Defendants' Subscribers with respect to the claims that they authorized resulted in Plaintiffs suffering monetary damages within the jurisdictional limits of this Court. Accordingly, there is now due, owing, and unpaid from Defendants to Plaintiffs an amount to be proven at trial for the services provided by Plaintiffs to Defendants' Subscribers that were authorized by Defendants.

### CONDITIONS PRECEDENT

127.    All conditions precedent have been performed or have occurred.

### ATTORNEY'S FEES

128.    The foregoing paragraphs are incorporated by reference.

129.    Plaintiffs are entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g) and Tex. Civ. Prac. & Rem. Code §§ 38.001.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood; Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano; CHCA Clear Lake, L.P. d/b/a HCA Houston Healthcare Clear Lake; hereby request that Defendants, Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield and IEC Benefit Administrators, Inc d/b/a AmeriBen Solutions, Inc. be cited to appear and answer this Complaint, and that upon final trial and determination thereof, that judgment be entered in favor of Plaintiffs, awarding them the following relief:

A.  The amount due under the Agreements and the terms of each Subscriber's respective health plan;

B.  Reasonable attorneys' fees and court costs; and

C.  Such other and further relief to which Plaintiffs may be entitled.

Dated this the 13th day of May 2025.

Respectfully submitted,

POLSINELLI PC

*/s/ Adam D. Chilton*
Adam D. Chilton
TX State Bar No. 24092255
POLSINELLI PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 661-5515
Facsimile:  (214) 279-2335
adam.chilton@polsinelli.com

*Counsel for Plaintiffs*